IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:22-CV-404-FL

| | | |
|---|---|---|
| BIOLINK LIFE SCIENCES, INC., Plaintiff, | ) | |
| v. | ) | ORDER |
| AVARA PHARMACEUTICAL SERVICES, INC., Defendant. | ) | |

This matter is before the court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (DE 68). The motion has been briefed fully, and in this posture, the issues raised are ripe for ruling. For the following reasons, the motion is denied.

**STATEMENT OF THE CASE**

Plaintiff, a North Carolina pharmaceutical development company, commenced this action September 2, 2022, in Wake County Superior Court, alleging breach of contract and violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1. Plaintiff seeks damages, treble damages, interest, and attorneys' fees.

Defendant, a Delaware corporation, filed notice of removal October 5, 2022, invoking this court's diversity jurisdiction. Defendant then moved to dismiss the complaint and for a more definite statement. That motion was briefed fully, but prior to any ruling by the court, defendant's attorneys moved to withdraw from representation on the basis of a dispute over their fee agreement with defendant.

Plaintiff moved to amend its complaint April 6, 2023. Shortly thereafter, April 11, 2023, the court granted defense counsel's motion to withdraw, directing defendant to cause new counsel to file notice of appearance. The court granted plaintiff's motion to amend May 22, 2023, thereby terminating as moot defendant's motions to dismiss the original complaint and for a more definite statement. Plaintiff filed amended complaint June 5, 2023, alleging the same contract and UDTPA claims.[1]

After defendant failed to answer and no new counsel filed notice of appearance, on plaintiff's motion, the clerk entered defendant's default September 14, 2023. Plaintiff then moved for default judgment, which motion the court granted October 27, 2023. The court thus awarded plaintiff $568,356.58 in damages, plus costs, and closed the case.

Defendant moved to set aside the default judgment pursuant to Federal Rule of Civil Procedure 60(b) June 5, 2024. The court granted this motion and vacated judgment March 11, 2025. Defendant then filed answer and partial motion to dismiss plaintiff's UDTPA claim pursuant to Rule 12(b)(6). The court granted defendant's partial motion to dismiss July 16, 2025, and a period of discovery regarding plaintiff's remaining breach of contract claim followed.

Defendant filed the instant motion for summary judgment April 1, 2026, supported by statement of material facts and appendix consisting of: 1) documents, including executed manufacturing and supply agreement (the "Agreement"), draft Agreement, supplier audit report, and warning letter addressed to Jost Chemical Co. ("Jost"); 2) deposition testimony of plaintiff's owner, president, and chief scientific officer Deanna Nelson ("Nelson"), plaintiff's regulatory affairs contractor Nancy Chew ("Chew"), and defendant's site director Carlos Gierbolini ("Gierbolini"); and 3) correspondence among plaintiff, defendant, and FDA.

[1] Hereinafter, all references to the "complaint" in this order, or to "Compl." in citations, are to this operative amended pleading at docket entry 27, unless otherwise specified.

Plaintiff responded, relying on responsive statement of material facts, excerpt of FDA Regulatory Procedures Manual, and appendix including: 1) declaration of Nelson; 2) deposition testimony of Gierbolini, Nelson, and Chew; 3) documents, including Agreement, supplier audit report, and Jost audit rating; and 4) correspondence among plaintiff, defendant, and FDA.

Defendant replied.

**STATEMENT OF UNDISPUTED FACTS**

Plaintiff has proprietary rights to Phosveda, a drug product containing Calcium Succinate USP,[2] for which plaintiff was seeking authorization for clinical use from the United States Food and Drug Administration ("FDA"). (Def's Resp. Stmt. (DE 81) ¶ 1).[3] Under a 2017 contract not at issue here, defendant successfully manufactured three registration batches of Phosveda in its facility in Puerto Rico. (Id. ¶ 13).

Subsequently, in October 2019 the parties entered into the Agreement for full-scale production of Phosveda by defendant, subject to certain terms and conditions. (Pl's Resp. Stmt. (DE 76) ¶¶ 1, 2); see Agreement (DE 73-1)). Among other provisions, defendant agreed to "use Commercially Reasonable Efforts to ensure that [plaintiff's] Product requirements are met." (Agreement (DE 73-1) § 8.1).

Pursuant to the Agreement, plaintiff ultimately was responsible for seeking FDA approval for Phosveda by submission of a New Drug Application. (Pl's Resp. Stmt. (DE 76) ¶ 3). Specifically, the Agreement states that "[plaintiff] shall have responsibility for making all contacts, filings, and submissions with respect to the Products to the FDA or other applicable Regulatory

---

[2] "USP" stands for the United States Pharmacopeia, a written document of reference standards for medicinal ingredients.

[3] Where a fact asserted in a party's statement of material facts is undisputed, the court cites to the opposing party's responsive statement of facts, where it indicates the fact is admitted, undisputed, or without opposing fact.

Authorities in the Territory and for obtaining all Government and Regulatory Approvals required for commercial sale of Product in the Territory." (Agreement (DE 73-1) § 10.2.1). However, defendant agreed to provide plaintiff "with any information or documentation in its possession, control or ownership and to render any other assistance reasonably requested and necessary to enable [plaintiff] to make an application to any Regulatory Authority that is necessary for [defendant] to be empowered to perform under this Agreement." (Id. § 10.2.2). Additionally, defendant agreed to "implement, as soon as reasonably practicable any change to the Manufacture of [Phosveda] that is required or recommended by the FDA." (Id. § 2.3.1).

Under a section titled "Early Termination by [plaintiff]," the Agreement states:

> Notwithstanding anything contained in this Agreement to the contrary:
>
> If as a result of the FDA's inspection of [defendant's] facility, which is expected to occur in or about July 2020, the FDA issues any regulatory action that prevents or otherwise adversely affects [defendant's] ability to fully and timely comply with its obligations under this Agreement and such actions are due solely to failures by [defendant], [plaintiff] shall have the right to terminate this Agreement and receive a return of all amounts previously paid to [defendant] for Capital Investments.

(Agreement (DE 73-1) § 14.10). "Regulatory action" is not defined within the Agreement. (See id. § 1). Separately, under a section titled "Termination for Breach," the Agreement states:

> This Agreement may be terminated by either Party if the other Party fails to remedy and make good any material default in the performance of any condition or obligation under this Agreement within thirty (30) days of the date a written notice of such default and intention to terminate is sent to the defaulting Party.

(Agreement (DE 73-1) § 14.2).

Plaintiff paid defendant $490,195.00 through one or more unspecified transactions. (Def's Resp. Stmt. (DE 81) ¶ 21).

In December 2019, plaintiff submitted to FDA a new drug application, listing defendant as Phosveda's manufacturer. (Pl's Resp. Stmt. (DE 76) ¶ 8). Due to COVID-19 restrictions, FDA

requested from defendant documentation verifying its production capabilities, rather than conducting an on-site inspection. (Id.). Following defendant's document submission, FDA sent plaintiff a "Complete Response Letter" August 10, 2020 (the "August 10, 2020, Letter"), informing plaintiff that the agency "cannot approve [plaintiff's new drug] application in its present form." (Id.; August 10, 2020, Letter (DE 73-5) at 2).[4] FDA also sent defendant a "Post-Application Action Letter" August 19, 2020 (the "August 19, 2020, Letter"), stating "FDA does not consider [defendant's] facility ready to support commercial operations of the subject drug applications." (August 19, 2020, Letter (DE 77-7) at 2).

Plaintiff submitted an amended new drug application in August 2021, and received from FDA another Complete Response Letter January 20, 2022 (the "January 20, 2022, Letter), which again stated that FDA "cannot approve [plaintiff's new drug] application in its present form." (Pl's Resp. Stmt. (DE 76) ¶ 9; January 20, 2022, Letter (DE 73-10)). FDA also sent defendant another Post-Application Action Letter February 3, 2022 (the "February 3, 2022, Letter"), noting that FDA still did "not consider [defendant's] facility ready to support commercial operations of the subject drug application." (February 3, 2022, Letter (DE 73-16) at 2). Defendant sent FDA a response February 24, 2022 (the "February 24, 2022, Response). (Pl's Resp. Stmt. (DE 76) ¶ 18). The next day, Nelson stated that defendant's February 24, 2022, Response "stated everything clearly and succinctly." (Id. ¶ 22).

Although they dispute the reason or reasons, the parties agree that more than two years after entering the Agreement, defendant was not able to qualify equipment to manufacture Phosveda at the scale contemplated in the Agreement. (Def's Resp. Stmt. (DE 81) ¶ 8).

[4] Page numbers in citations to the record refer to the page number of the document designated in the court's case management and electronic case filing (CM/ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

Plaintiff sent defendant a letter dated March 14, 2022 (the "Termination Letter"), wherein plaintiff "g[ave] notice of early termination of the Agreement pursuant to Section 14.10 thereof." (Termination Letter (DE 73-4) at 2). The Termination Letter also states:

> [Defendant] has failed to perform under its Agreement with [plaintiff], resulting in significant actual and consequential damages to [plaintiff]. Given the stated inability of [defendant] to fully and timely comply with its obligations under the Agreement, combined with [defendant's] inability or unwillingness to confirm that its deficiencies will promptly be rectified to enable production of [plaintiff's] drug, [plaintiff] has no choice but to terminate the Agreement and require a full refund of its monies paid.

(Termination Letter) (DE 73-4) at 4). Plaintiff demanded return of the $490,195.00 it earlier paid, which defendant refused. (See id.).

**COURT'S DISCUSSION**

A. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).[5] Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is

---

[5] Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

"material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B. Analysis

When exercising diversity jurisdiction over state law claims, this court must apply the choice of law rules applicable in the forum's state courts. See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). North Carolina courts enforce contractual choice of law provisions

"unless the chosen state has no substantial connection to the transaction and there is no other reasonable basis for the parties' choice, or the law of the chosen state violates a fundamental public policy of North Carolina." Vizant Techs., LLC v. YRC Worldwide, Inc., 373 N.C. 549, 556 (2020); see Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262 (1980) ("[W]here parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect.").

Here, the parties agreed that the Agreement "will be governed by and construed in accordance with Laws of the State of Delaware." (Contract (DE 27-1) ¶ 26). Thus, where defendant is a Delaware corporation and neither party argues Delaware law violates fundamental North Carolina public policy, the court must give effect to the parties' choice of Delaware law. Vizant Techs., 373 N.C. at 556.

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." Connelly v. State Farm Mut. Auto. Ins. Co., 135 A.3d 1271, 1279 n.28 (Del. 2016). When one party breaches a contract, "the non-breaching party is entitled to recover damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." Paul v. Deloitte & Touche, LLP, 974 A.2d 140, 146 (Del. 2009).

Here, defendant contends that the undisputed facts show that plaintiff is not entitled to any damages because plaintiff improperly terminated the Agreement under § 14.10 of the Agreement, which reads:

> 14.10 Early Termination by [plaintiff].
>
> Notwithstanding anything contained in this Agreement to the contrary:
>
> If as a result of the FDA's inspection of [defendant's] facility, which is expected to occur in or about July 2020, the FDA issues any regulatory action that prevents or

> otherwise adversely affects [defendant's] ability to fully and timely comply with its obligations under this Agreement and such actions are due solely to failures by [defendant], [plaintiff] shall have the right to terminate this Agreement and receive a return of all amounts previously paid to [defendant] for Capital Investments.

(Agreement (DE 73-1) § 14.10). Defendant argues that FDA did not issue a "regulatory action," that FDA's letters did not "adversely affect[] [defendant's] ability to fully and timely comply with its obligations," and that any action by FDA was not "due solely to failures by [defendant]." (Id.). The court considers these arguments in turn.

First, defendant insists there was no "regulatory action" upon which plaintiff could base its termination under § 14.10. The court disagrees.

"Regulatory action" is not defined within the Agreement, and the court must "interpret clear and unambiguous terms according to their ordinary meaning." GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 780 (Del. 2012). Although defendant argues no "regulatory action" occurred, defendant provides no definition of "regulatory action" other than its ordinary meaning: "something that is done" "relating to a regulation or regulations." See Action, Oxford English Dictionary Online (2026) (entry revised 2010) (last visited July 31, 2026); Regulatory, Oxford English Dictionary (entry revised 2009) (last visited July 31, 2026). Therefore, the court concludes that the August 10, 2020, Letter; the January 22, 2022, Letter; and the February 3, 2022, Letter, each issued by FDA in response to plaintiff's applications, and each mentioned in plaintiff's Termination Letter, fall within the ordinary meaning of "regulatory action." (See Termination Letter (DE 73-4) at 3-4).

Thus, plaintiff's termination of the Agreement does not fail for lack of regulatory action, and defendant is not entitled to summary judgment on this basis.

Next, defendant argues that the letters sent by FDA did not "adversely affect[] [defendant's] ability to fully and timely comply with its obligations" because there were no binding

deadlines set by the Agreement. (See Agreement (DE 73-1) § 14.10).

"Unless the contract provides that time is of the essence, [Delaware law] will permit the parties a reasonable time to [perform]." Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1161 (Del. 2010). The Agreement here does not contain a time is of the essence clause; therefore, defendant had to comply with its obligations within "a reasonable time." Id. "Ordinarily, questions like what is a reasonable time for [performance] cannot be resolved on summary judgment because the factfinder must assess prior dealings of the parties, the practice in the relevant community and trade or business and other circumstances surrounding the execution and performance of the contract." F.A.M.E. LLC v. EmTurn LLC, --- A.3d ---, 2026 WL 1065704, at *4 (Del. Apr. 20, 2026)). Thus, whether any of FDA's letters adversely affected defendant's ability to perform within a reasonable time is a question of fact that must be left to the jury.

Finally, defendant argues that plaintiff's termination was improper because the letters sent by FDA were not "due solely to failures" by defendant. (See Agreement (DE 73-1) § 14.10). The reason or reasons for FDA's letters is a question of fact. See Hecksher v. Fairwinds Baptist Church, Inc., 115 A.3d 1187, 1202 (Del. 2015) (noting that an actor's motivation is a factual determination).

Defendant points to portions of the August 10, 2020, Letter and the January 20, 2022, Letter which defendant contends describe issues with plaintiff's new drug application not attributable to defendant. (E.g. January 20, 2022, Letter (DE 73-10) at 3 (suggesting "relevant information supporting the commercial drug product" was not "included in the correct sections of Module 3.2.P")).

However, defendant does not identify any portion of the February 3, 2022, Letter, which was not due to a failure by defendant. That letter includes the following outline of deficiencies:

At the conclusion of the assessment, the following deficiency(ies) remain:

**Facility Deficiency 1:**
Per your response to Facility Deficiency 1 in the post application action letter, the blender, checkweigher, rejection station, and metal detector related to the scale up activities were still in execution process, indicating that your site is still not ready for commercial production. The qualification plans with proposed completion dates for the blender, checkweigher, rejection station, and metal detector for commercial production were still not provided.

**Facility Deficiency 2:**
You state that the manufacturing of a scale up feasibility batch will be completed by October 2020 and the data from the scale up feasibility batch will be provided to the FDA in a resubmission of the application anticipated in November 2020. However, no information regarding any scale up batches was provided in the resubmission dated 8/10/2021 and the 10/7/2021 amendment.

**Facility Deficiency 3:**
Per the cover letter dated 10/7/2021 for your application, AIAC International Pharma LLC (FEI: 3011580268) is not ready for inspection until early January 2022. An inspection may be required before this NDA can be approved.

(February 3, 2022, Letter (DE 73-16) at 3).

The first and third of these deficiencies appear to be due to defendant's lack of qualification of its equipment and lack of readiness for FDA inspection, and defendant makes no argument to the contrary.[6] Additionally, plaintiff argues that any lack of necessary information in Facility Deficiency 2 was due to defendant's failure to successfully manufacture a scale up feasibility batch. Plaintiff points to defendant's February 24, 2022, Response, which lists "two items . . . identified requiring resolution prior" to manufacture of a scale up feasibility batch: "Inability to consistently encapsulate Drug Product formulation to the target weight with current Calcium Succinate (API)[7] USP specifications" and "Inconsistent dissolution results." (Feb. 24, 2022, Response (DE 73-17)

---

[6] "AIAC International Pharma LLC (FEI:3011580268)" is defendant's manufacturing facility in Puerto Rico. (See Agreement (DE 73-1) at 33).

[7] "API" stands for "Active Pharmaceutical Ingredient."

at 8). Construing this evidence in the light most favorable to plaintiff, the second facility deficiency described in the February 3, 2022, Letter was due to defendant's failure to meet the product specification set out in the Agreement. Thus, a reasonable jury could conclude that issuance of the February 3, 2022, Letter was due solely to failures by defendant.

In sum, questions of fact remain as to whether plaintiff properly terminated the Agreement under § 14.10.[8] Therefore, defendant is not entitled to judgment as a matter of law on the question of damages, and summary judgment is not warranted. See Myrick, 395 F.3d at 489-90.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 68) is DENIED. Where claim remains for trial in accordance with case management order entered June 6, 2025, as amended January 16, 2026, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and file within **14 days** from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates. In addition, the parties shall specify if they wish to schedule a court-hosted settlement conference or additional alternative dispute resolution procedures in advance of trial, and if so the date for completion of such.

SO ORDERED, this the 5th day of August, 2026.

LOUISE W. FLANAGAN
United States District Judge

---

[8] Where genuine disputes of material fact preclude summary judgment on plaintiff's claim for damages under § 14.10 of the Agreement, the court does not reach plaintiff's alternative theory that the Agreement was terminated properly under § 14.2.